IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PETER A. TUCCI, SR.,

    Plaintiff,

  v.

THE HARTFORD FINANCIAL
SERVICES GROUP, INC., et al.,

    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

HON. JEROME B. SIMANDLE

Civil No. 08-4925 (JBS/JS)

**<u>OPINION</u>**

APPEARANCES:

Carlo Scaramella, Esq.
LAW OFFICES OF CARLO SCARAMELLA, LLC
One Greentree Centre, Suite 201
10000 Lincoln Drive East
Marlton, NJ 08053
  Counsel for Plaintiff

Thomas E. Schorr, Esq.
SMITH, STRATTON, WISE, HEHER & BRENNAN, LLP
2 Research Way
Princeton, NJ 08540
  Counsel for Defendants

**SIMANDLE,** District Judge:

  This matter is before the Court on two motions for summary judgment by Defendants Twin City Fire Insurance Company ("Twin City") and Hartford Casualty Insurance Company ("Hartford") against claims of bad faith, breach of contract, and declaratory judgment raised by Plaintiff, Peter A. Tucci, Sr.  Defendant Twin City moves for summary judgment of Plaintiff's declaratory judgment claim in Count V.  [Docket Item 41.]  Defendant Hartford moves for summary judgment of Plaintiff's counts alleging bad

faith (Counts I-III) and additionally moves to dismiss the action without prejudice in favor of contractual appraisal. [Docket Item 42.] Because the Court concludes that Plaintiff's insurance policy is not ambiguous in the disputed portions, and that Defendants' delays in paying Plaintiff's claim and denial of certain areas of coverage were undisputably based on valid or at least debatable reasons, the Court will grant Defendant Hartford's motion. Additionally, because the Court concludes that Plaintiff's policy language regarding advertising injury coverage is not ambiguous, and that the policy excluded the duty to defend against claims for trademark violations, the Court will grant Defendant Twin City's motion for summary judgment.

**I.   FACTS AND PROCEDURAL HISTORY**

This case revolves around a parcel of land and the buildings thereon located at 2015 Burlington Mount Holly Road in Westhampton, New Jersey, and the insurance policy covering it. For at least 30 years, there have been hotels operating on the property. Plaintiff has owned the land in question for decades, but only took possession of the buildings there in 2006 after he evicted the long-term tenants for material breach of their lease. As a result, Plaintiff took out additional insurance on the property by expanding his existing policy, issued by Defendants. Upon taking possession of the property on September 1, 2006,

Plaintiff discovered that the hotel buildings had been vandalized and that furnishings and fixtures he had expected to be there had been removed.  He subsequently filed a claim for vandalism and theft with Defendant Hartford, but has never been able to resolve his claim.  This litigation followed.

The following facts are not meaningfully disputed in the record.

## A.  History of the Property

Plaintiff inherited the land at 2015 Burlington Mount Holly Road from his parents, and became sole owner in 1985.  (Tucci Examination Under Oath at 7:17-23, Schorr Cert. Ex. 1.)  His family had been renting the property to long-term tenants since at least 1958, pursuant to a 99-year ground lease.  (Lease Agreement at 1, HA 1316, Rose Cert. Ex. 2.)[1]  The tenants had built and operated hotels on the land over the decades.  (Tucci EUO at 9:19-22.)  Since at least 1999, a Howard Johnson Motor Lodge hotel franchise was operated on the property.  (Management Agreement, Rose Cert. Ex. 3.)  For all times relevant, the leaseholder of the land was an entity known as Northeast Hospitality Properties, or a derivation thereof.  (Id. at 11:22-12:7.)  In 1999, Northeast Hospitality Properties ("Northeast")

---

[1] Many of the documents submitted in evidence were Bates numbered by Defendant Hartford Casualty as "HA XXXX."  Where applicable and useful, the Court will include these Bates numbers for ease of reference.

3

entered into a management agreement with an entity called Vraj Brig PA, LLC ("Vraj Brig") under which Vraj Brig assumed management and operational control over the premises. (Management Agreement at 1-2.)

In addition to the Howard Johnson motel, there were also three other buildings on the land, which were operated as an independent hotel (the "ABC buildings").  (See Aerial Photo, Ex. Patel 2, Schorr Cert. Ex. 2.)  Prior to September of 2006, the ABC buildings were largely occupied by guests referred and subsidized by the Burlington County Department of Social Services.  (Patel Dep. at 33:14-20, Schorr Cer. Ex. 2.)  Between the Howard Johnson and the ABC buildings, the complex had more than 140 rooms.  (Dec. 8, 2006 Schleifer Report, HA 1299-1303, Rose Cert. Ex. 4.)

Northeast was responsible under the lease for all expenses and taxes on the property, and additionally paid monthly rent to Plaintiff amounting to $20,000.  (Tucci Dep. at 452:1-25.) According to the Management Agreement that Northeast signed with Vraj Brig in 1999, this rent was to be paid by Vraj Brig, who also paid an additional $15,000 monthly "manager's fee" to Northeast.  (Management Agreement at 5, HA 1371.)  Yashvant Patel, an employee of Vraj Brig, testified that the manager's fee was actually closer to $11,000 per month, which is consistent with Northeast's 2005 Income Statement.  (Patel Dep. at 88:9-13;

Northeast Income Statement, Scaramella Cert. Ex. 4 at HA 1221.)

In addition to operating the two hotels, Vraj Brig also leased space in one of the buildings to a restaurant operator. (Patel Dep. at 100:16-24.)  Vraj Brig owned the furniture and appliances in the hotel properties, including hotel room beds and laundry machines.[2]  (Patel Dep. at 70:1-16, 66:13-25.) Additionally, the owner of the restaurant owned the furnishings and equipment of the restaurant.  (Id. 102:14-15, 106:22-23.)

## B. Eviction of Northeast and Expansion of Insurance Policy

Plaintiff began eviction proceedings against Northeast in late 2005 due to, at least in part, Northeast's failure to acquire adequate insurance on the property.  (Tucci EUO at 18:8-19:14.)  On July 21, 2006, Plaintiff prevailed when the Superior Court of Burlington County, Law Division, entered a judgment of possession of the hotel premises to Plaintiff.  (July 21, 2006 Order, Schorr Cert. Ex. 3.)  The court subsequently entered a

---

[2] The Court notes that Plaintiff denies the truth of this statement, but also notes that Plaintiff offers no competent evidence to dispute this testimony, other than to point out that Mr. Patel also believed that Vraj Brig owned the locks on the doors in the hotel.  (Pl.'s Resp. Tto Def. Hartford's Statement of Material Facts at ¶ 6.)  The Court infers from this statement that Plaintiff does not believe that Mr. Patel is correct in stating that Vraj Brig owned the door locks, and thereby implies that Mr. Patel's testimony regarding ownership is not credible. On summary judgment, however, a party opposing summary judgment may not "prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." Big Apple BMW, Inc. v. BMW of N. Amer., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

stay of execution of its judgment, and ordered that "the status quo is to be maintained by all parties . . . . There shall be no destruction, disposal or sale of any property at the leased premises that is not in the ordinary course of the business of the motel."  (Aug. 8, 2006 Order, Schorr Cert. Ex. 4.)

In anticipation of the eviction, Plaintiff worked with his insurance broker, the Geisenheimer Agency, to modify his existing insurance policy with Hartford.  (Geisenheimer Dep. at 42:22-43:1, Schorr Cert. Ex. 8.)  Plaintiff's existing policy, number 13 UUN CR9352, already covered twenty two commercial properties in various locations throughout New Jersey.  (Rose Cert. Ex. 1, HA 1839-49.)  Plaintiff's broker requested that the policy be expanded to cover the hotel premises at 2015 Burlington Mount Holly Road, to cover both the buildings themselves and their contents up to $3,500 per room, and also to cover loss of income at the premises up to $1,000,000.  (Jul. 27, 2006 Geisenheimer e-mail, Schorr Cert. Ex. 8.)

Plaintiff's Hartford policy offered four different areas of coverage: 1) Property Choice, 2) Commercial Inland Marine, 3) Commercial Auto, and 4) Commercial General Liability.  (Rose Cert. Ex. 1 at HA 1818-19.)  Within each of these areas, the policy provided for coverage of specific kinds of property and loss.  Within Property Choice, the policy provided for payment of the actual cash value or replacement cost of damage or loss of

6

buildings and business personal property located on covered premises ("property coverage"). (Rose Cert. Ex. 1 at HA 1857, 1870-71.) The Property Choice area of coverage also provided for "Business Interruption" coverage, in the form of business income loss or rental income loss ("income coverage"). (Rose Cert. Ex. 1 at HA 1760-61.) Income coverage would pay the insured for the "actual loss of business income" that results from a disruption of business due to damage or loss to a covered premises. (Id.)

Plaintiff's policy had previously offered a maximum building and property coverage (described in the policy as the Blanket Buildings and Business Personal Property coverage) of $13,960,900 and income coverage (described in the policy as the Blanket Special Business Income coverage) of $100,000. (Rose Ex. 1, HA 1833-35.)

## C. The Policy

On August 3, 2006, Hartford increased the coverage of Plaintiff's policy, as detailed in Endorsement 2 to the policy. (Rose Cert. Ex. 1, HA 1736-1759.) Endorsement 2 added the hotel premises at 2015 Burlington Mount Holly Road as "Premises 23" and modified the policy to increase the policy's blanket Buildings and Business Personal Property coverage to $19,442,900 and increased the policy's blanket Business Income coverage to $1 million. (Id. at HA 1736-37, 1740.) The specific description of the hotel property, listed as Premises No. 23, specified that the

covered buildings and business personal property would be covered under the blanket building and personal property limit, and that business income losses would be covered under the blanket special business income limit.  (HA 1757-58.)  As a result of this increased coverage, Plaintiff's premiums more than doubled, from $44,160 to $92,142.  (HA 1816, 1736.)

Plaintiff testified that, when applying for coverage, he did not request a specific business income coverage limit, but merely trusted Mr. Geisenheimer to set the coverage level appropriately. (Tucci Dep. at 636:10-17, Schorr Cert. Ex. 14.)  He also testified that he was unaware that business income coverage had a separate coverage limit distinct from the blanket property coverage limit.  (Tucci Dep. at 629:4-15.)

Plaintiff's policy defined property covered under "business personal property" to include, in addition to the insured's own property, "personal property owned by others, that is in your care, custody or control" but excluded property that is "owned by your tenants."  (Rose Cert. Ex. 1, at HA 1857-58.)

Under Plaintiff's 99-year ground lease agreement with Northeast, upon termination of the lease, the landlord acquires the buildings and structures on the land, including "alterations, changes, additions and improvements which may have been made upon the premises (except movable furniture or movable trade fixtures put in at the expense of Tenant)" and the tenant is authorized to

8

"remove all of Tenant's personal property from the demised premises, and all property not so removed shall be deemed to have been abandoned . . . ."  (Lease Agreement at HA 1333-34.)

Plaintiff's policy additionally included, in the area of Commercial General Liability coverage (which was issued by Defendant Twin City, rather than Hartford Casualty), a "Personal and Advertising Injury Liability" provision, which provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

(Rose Cert. Ex. 1 at HA 1933.)  The policy defines "personal and advertising injury" to include, among other things, "Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services" and also includes "Copying, in your 'advertisement,' a person's or organization's 'advertising idea' or style of 'advertisement.'" (Id. at HA 1945.)

The policy excludes from coverage "infringement of intellectual property rights."  The IP exclusion specifies that the policy does not cover

'Personal and advertising injury' arising out

> of any violation of any intellectual property
> rights such as copyright, patent, trademark,
> trade name, trade secret, service mark or
> other designation of origin or authenticity.
> However, this exclusion does not apply to
> infringement, in your 'advertisement', of . .
> . Slogan, unless the slogan is also a
> trademark, trade name, service mark or other
> designation of origin or authenticity . . .

(Id. at 1934.)

Finally, the Policy included a mandatory appraisal clause in

the event of a disputed claim.  The procedure laid out in the

policy stated that

> If we and you disagree on the amount of loss,
> either may make written demand for an
> appraisal of the loss. In this event, each
> party will select a competent and impartial
> appraiser. The two appraisers will select an
> umpire. If they cannot agree, either may
> request that selection be made by a judge of a
> court having jurisdiction. The appraisers will
> state separately the amount of loss. If they
> fail to agree, they will submit their
> differences to the umpire. A decision agreed
> to by any two will be binding. Each party
> will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraisal
> and umpire equally.
> If there is an appraisal, we will still retain
> our right to deny the claim on the grounds
> that it is not covered under this policy.

(Id. at HA 1850.)

### D.  Removal and Transfer of Possession of Hotel Premises

On August 17, 2006, the Superior Court of Burlington County

ordered that the warrant of removal it had granted to Plaintiff

in July would be stayed only until August 31.  (Aug. 17, 2006

Order, Schorr Cert Ex. 5.)  Consequently, in mid-August,
Northeast and Vraj Brig prepared to depart the premises and made
arrangements for the removal of their property.  Mr. Patel of
Vraj Brig testified that he offered the continued management
services of Vraj Brig to Plaintiff, who declined the offer.
(Patel Dep. at 66:5-12.)  Failing that, Mr. Patel offered,
instead, to sell or lease the property of Vrag Brig, including
the furnishings and appliances, in the hotels to Plaintiff, who
refused that offer as well.  (Patel Dep. at 66:20-25, 67:11-15.)
Mr. Patel additionally testified that he witnessed Plaintiff
reject a similar offer from the restaurant owner.  (Id. at
103:12-106-3.)

Plaintiff had visited the hotel premises on August 2 with an
individual named Vincent Ciro, whom Plaintiff anticipated
employing as the new hotel and property manager.  (Patel Dep. at
299:1-14.)  Both Plaintiff and Mr. Ciro submitted certifications
to the Superior Court of Burlington County testifying that they
were unimpressed with the condition of the premises.  Mr. Ciro
certified that he believed that, due to the neglect and disrepair
of the buildings, "the hotel was not in a proper rentable
condition" and that it "would require the expenditure of
approximately $900,000 to $1.2 million dollars" to bring the
hotel into reasonable condition.  (Aug. 15, 2006 Ciro Cert. ¶¶ 4,
7, Schorr Cert. Ex. 6.)  Plaintiff certified that he observed

11

"the poor condition of the property.  Such poor condition
included mold, stained carpeting, non-functioning HVAC systems,
evidence of water infiltration and leaks, peeling paint,
crumbling concrete on stairways . . . and other evidence of
deterioration and neglect."  (Aug. 15, 2006 Tucci Cert. ¶ 3,
Schorr Cert. Ex. 7.)

In the final few days of August, Vraj Brig began to move all
of the furniture and equipment out of the hotels, loading them
into multiple trucks which were parked outside the buildings.
(Patel Dep. at 71:1-7.)  Mr. Patel saw Plaintiff on the premises
during this time when the property was being moved out of the
hotels.  (Id. at 70:18-25.)  On August 31, 2006, after everything
had been moved out, Mr. Patel offered to walk through the
property with Plaintiff to account for the condition of the
property, but Plaintiff declined.  (Id. at 73:1-4.)  Vraj Brig
had removed virtually everything from the hotels, including HVAC
units from the walls, the hot water heater, a communication
system, and the locks on the doors.  (Id. at 70:3-16.)
Additionally, the restaurant owner had removed all of his
equipment and furnishings from the restaurant.  (Id. at 106:22-
23.)

Despite the fact that he had been informed that all the
movable furnishings would be removed from the premises, Plaintiff
testified that he expected, when he arrived at the premises on

12

September 1, 2006, that the hotel would immediately be operational. (Tucci Dep. at 459:3-7, Scaramella Decl. Ex. 1.) Plaintiff testified that he had based this expectation on the language of the August 8, 2006 Order of the Burlington County Superior Court, which ordered that "the status quo is to be maintained by all parties" and that "[t]here shall be no destruction, disposal or sale of any property at the leased premises that is not in the ordinary course of the business of the motel." (Aug. 8, 2006 Order; Tucci Dep. at 449:15-25.)

When Plaintiff arrived on September 1, he discovered that, in addition to the movable furnishings, several items of property that he considered to be fixtures had been removed as well, including the door locks, and the HVAC units. Additionally, Plaintiff discovered substantial vandalism that had occurred throughout the premises, including spraypaint in bathrooms and holes in the walls. (Hotel Report at 3, attached as Tucci 1 to Schorr Ex. 14.) Plaintiff described the facility as "totally decommissioned." (Id.)

### E. Submitting the Claim to Hartford

Plaintiff called his insurance broker to discuss the damage almost immediately. (Geisenheimer Dep. at 49:21-50:10.) In that conversation, Plaintiff told Mr. Geisenheimer that he believed the vandalism had been committed by the tenants because of the eviction notice. (Id. at 49:24-25.) Mr. Geisenheimer testified

that, after the two discussed whether to submit the damage to
Hartford as a claim for vandalism and/or theft, Plaintiff decided
that he would not because he had been planning to renovate the
premises anyway, and the policy is "not a maintenance policy."
(Id. at 50:3-7.)  Consequently, Mr. Geisenheimer did not notify
anyone at Hartford of the damage or the possibility of a claim.
(Id.)

However, approximately six weeks later, on or around October
15, 2006, Plaintiff called Mr. Geisenheimer again and announced
that, after consulting with an attorney, he wanted to put in a
claim on the damage and loss after all.  (Id. at 58:23-25.)  Mr.
Geisenheimer told him that, in order to do so, he would need to
submit a police report.  (Id. At 58:25-59:2.)  Within a few days,
Plaintiff had supplied the police report, and the claim was
submitted to Hartford on October 18, 2006.  (Loss Notice Form,
Rose Cert. Ex. 6.)

**F.  Claim Adjustment Begins**

On October 23, 2006, Jonathan Rose, an authorized claim
adjuster from Hartford Casualty, wrote to Plaintiff on behalf of
Hartford, acknowledging the claim and advising Plaintiff to abide
by the terms in his policy regarding "General Duties in Event of
Loss."  (Oct. 23, 2006 Letter, Rose Cert Ex. 7.)  The terms
include protecting the damaged property, taking an inventory of
all damaged property, permitting Hartford to inspect the property

14

and examine financial records, and otherwise generally cooperating with the investigation and claim adjustment.  (Id.) The letter also advised Plaintiff that, because "timely notice of the loss was not provided," Hartford would need to conduct a "full investigation . . . to determine if coverage exists for this loss."  (Id.)

Over the following few months, Hartford hired a building inspector and Plaintiff retained an adjuster to assist with the claim adjustment process.  (Rose Cert. ¶ 11; Oct. 25, 2006 Gillespie Letter, Rose Cert. Ex. 8.)  Plaintiff's adjuster, Todd Gillespie, hired a building inspector to assist with the building and business personal property claim.  (Gillespie Dep. at 68:3-23, Schorr Cert. Ex. 12.)  In late October or early November, 2006, the two building inspectors, along with Jonathan Rose, conducted an inspection of the property.  (Rose Cert. ¶ 11.) Both inspectors prepared estimates of property damage. Hartford's inspector, Joseph Schliefer, Sr., of Schleifer Associates, initially estimated damage due to vandalism at approximately $477,000, while Plaintiff's inspector, Carl Rodriguez of Mejor Consulting Group, estimated the loss at approximately $636,000.  (Dec. 8, 2006 Schleifer Rept., Rose Cert. Ex. 4; Nov. 30, 2006 Mejor Rept., Rose Cert. Ex. 5.)

In response to requests, Mr. Gillespie sent Hartford certain documentation of the property, including Northeast's 99-year

15

ground lease, the Vraj Brig management agreement, and the deed to the land.  Mr. Gillespie later submitted the Mejor Consulting estimate to Hartford.  (Rose Cert. ¶ 15, Ex. 5.)  Hartford requested additional information from Mr. Gillespie, such as documentation of ownership of some claimed items of loss such as the hotel door locks, the HVAC units, and the restaurant equipment, and inquired into when Plaintiff would be submitting a business income claim.  (Feb. 2, 2007 Rose Letter, Rose Cert. Ex. 10.)

On February 2, 2007, Mr. Gillespie notified Hartford that he had been advised by Plaintiff that there were "additional damages not represented" on the Mejor report, and that he would forward a supplemental claim for the additional damages later.  (Feb. 2, 2007 Gillespie Letter, Rose Cert. Ex. 11.)  During the month of February, 2007, Mr. Gillespie contacted Plaintiff several times with requests for various forms of documentation to support both the property damage claim as well as a business income claim. (Mar. 1, 2007 Gillespie Letter, Schorr Cert. Ex. 11.)  In early March, Mr. Gillespie received a letter from Plaintiff explaining that Plaintiff was dissatisfied with the way Gillespie was handling the insurance loss.  (Gillespie Dep. at 97:16-98:8, Schorr Cert. Ex. 11.)  Shortly thereafter, Mr. Gillespie spoke with Plaintiff on the telephone, where it was "agreed that [Plaintiff] wanted to proceed on his own at that point."  (Id. at

16

99:13-14.)

After Plaintiff fired Mr. Gillespie, Hartford heard nothing further from Plaintiff until a May 4, 2007 meeting, where Plaintiff presented Hartford with his revised property claim, which had increased substantially to approximately $3,217,000. Plaintiff did not present his business income claim at the meeting. (Rose Cert. ¶ 15.) Shortly thereafter, Jonathan Rose of Hartford memorialized the revised claim and requested documents that could support the unexpectedly high claim, such as contractor designs, invoices, estimates, drawings and lists of contractors involved in the repair. (May 15, 2007 Rose Letter, Rose Cert. Ex. 12.)

**G.  Claim Adjustment Stalls**

From May of 2007 until the initial filing of this action in July of 2008, the adjustment process stalled. In July of 2007, Plaintiff presented his business income claim for the first time, requesting approximately $1.5 million. (Jul. 20, 2007 Tucci Letter, Rose Cert. Ex. 14.) Hartford requested supporting documentation of the claim shortly thereafter. (Jul. 31, 2007 Rose Letter, Rose Cert. Ex. 14.) Indeed, over the course of the next year, Hartford reiterated its requests for documentation of Plaintiff's claims for building and property damage and business income at least ten times without receiving any documentation in response. (Jul. 31, 2007 Rose Letter, Rose Cert. Ex. 14; Aug.

17

21, 2007 Rose Letter, Rose Cert. Ex. 16; Sep. 28, 2007 Rose
Letter, Rose Cert. Ex. 17; Nov. 8, 2007 Gable Letter, Rose Cert.
Ex. 20; Dec. 14, 2007 Gable Letter, Rose Cert. Ex. 21; Jan. 21,
2008 Gable e-mail, Rose Cert. Ex 23; Feb. 26, 2008 Rose e-mail,
Rose Cert. Ex. 24; Mar. 10, 2008 Gable Letter, Rose Cert. Ex. 25;
Apr. 25, 2008 Rose Letter, Rose Cert. Ex. 27; May 20, 2008 Rose
Letter, Rose Cert. Ex. 28.)  However, Hartford's internal records
indicate that around the time that Plaintiff submitted his
initial business income claim, Jonathan Rose had noted to his
file that based, in part, on the information gleaned from the
income statements of the previous tenant Northeast, he might
estimate a business income claim of approximately $50,000 per
month.  (Internal Hartford Notes Rept., Scaramella Decl. Ex. 4 at
HA 0995.)

Several months after the May meeting, Plaintiff requested an
advance on his property claim on July 20, 2007, which Hartford
offered to pay in the amount of $200,000 on July 31.  (Rose Cert.
Exs. 31 & 32.)  The parties continued to meet and exchange
revised estimates and claims.  On October 19, 2007, for example,
Jonathan Rose met with Plaintiff and counsel, where Plaintiff
presented a slightly reduced property claim of $2,631,000.  (Rose
Cert. ¶ 23, Ex. 18.)  Plaintiff's revised property claim included
more detail than his May 2007 claim did, including, for example,
line items for 76 king-sized beds, three commercial clothes

18

dryers, 114 HVAC units, and repairs to a 4.5 ton damaged roof-top HVAC unit.  (Rose Cert. Ex. 18, HA 0645-48.)  In short, Plaintiff was seeking insurance coverage for the loss of property he never owned and the near-total refurbishment of a hotel complex he had personally certified to a court of law as exhibiting several significant signs of "deterioration and neglect" prior to taking possession.  (Aug. 15, 2006 Tucci Cert.)

However, throughout the year, Plaintiff continued to refuse Hartford any documentary evidence that could support the validity of his insurance claims.  Plaintiff explained in deposition testimony that he did not provide such documentation at the time, not because he did not have any such documentation (he later provided documents during discovery)[3], but because he did not think the requests were necessary; and the fact that they were demanded was an example of Hartford's bad faith.  (Tucci Dep. at 326:3-5, 329:3-7.)

Despite Tucci's failure to document his claims, Hartford endeavored to finalize the claim.  Hartford's building inspector revised his initial property damage estimate multiple times, taking into account information he was able to divine from

---

[3] In October of 2009, more than twelve months after filing suit in this action, and in response to a discovery request by Defendants, Plaintiff sent Defendants approximately twenty pages of financial records printed out from Plaintiff's computer, dating back to October of 2006, providing considerably more information than had previously been provided to Hartford. (Scaramella Decl. Ex. 5; Tucci Dep. at 9:2-21.)

Plaintiff's business property claims.  Mr. Schleifer's final estimate of property damage totaled $623,746 in replacement value.  (Mar. 10, 2008 Gable Letter, Rose Cert. Ex. 25.)  Based on this estimate, Hartford finally offered to pay Plaintiff the remaining undisputed amount of property damage based on its building inspector's upwardly-revised damage estimate, which would have amounted to an initial payment of approximately $287,000 to complete the inspector's "actual cash value loss" estimate and an additional $135,000 upon proof of finalized repairs to bring payment up to the inspector's "full replacement cost" estimate.  (May 20, 2008 Rose Letter, Rose Cert. Ex. 28.)

However, prior to sending Plaintiff the check, Hartford required that he sign an "undisputed proof of loss" statement, which set out their estimates of total damage figures and depreciation values.  (Id.)  Plaintiff refused to sign the form, expressing the concern that doing so would amount to an admission that he agreed with Hartford's determination of the full damages and depreciation value.  (July 3, 2008 Tucci Letter, Rose Cert. Ex. 31.)  He requested, instead, that he be allowed to sign the partial proof of loss form that he had been offered in 2007. (Id.)  Hartford explained that if he wished, they had no objection to Plaintiff annotating or modifying the proof of loss form to indicate his qualifications and understanding that the form did not amount to an admission of limitations of coverage or

value (July 18, 2008 Gable e-mail, Rose Cert. Ex. 32), but Plaintiff nonetheless refused.

Plaintiff stated in several of his letters to Hartford that he was being forced to shoulder most of the costs of the restoration of his hotel without the assistance of Hartford. (See e.g., Mar. 24, 2008 Tucci Letter, Scaramella Decl. Ex. 4.) However, Plaintiff testified that he was not financially constrained or limited in his restoration by the failure of Hartford to pay additional advances on his claims.  (Tucci Dep. at 390:3-14.)

**H.  Appraisal**

In the spring of 2008, Hartford wrote to Plaintiff requesting that, since the sides were clearly not going to reach a voluntary agreement on the final claim, they submit the dispute to appraisal, as mandated in Plaintiff's policy.  (May 20, 2008 Rose Letter, Rose Cert. Ex. 28.)  Plaintiff initially indicated an agreement with the proposal, representing that he was searching for an appraiser, (July 3, 2008 Tucci Letter), but ultimately informed Hartford of his intent, instead, to pursue his claim in litigation rather than appraisal.  (Sep. 8, 2008 Gable Letter, Rose Cert. Ex. 34.)  Hartford responded that Plaintiff's decision to file suit was "in direct contravention of his duty under the policy to engage in the appraisal process . . . ."  (Id.)

21

I.   **Howard Johnson Trademark Action; Personal and Advertising Injury Coverage**

Meanwhile, Howard Johnson International, Inc. ("HJI") filed suit in federal court, naming as defendants Peter Tucci (Plaintiff in the instant action) as well as Vraj Brig and an individual named Pankaj Sheth.  See Howard Johnson Int'l, Inc. v. Vraj Brig, LLC, Civ. No. 08-1466, 2010 WL 215381 (D.N.J. Jan. 14, 2010).  HJI brought claims of trademark infringement against the defendants because Mr. Tucci refused to take down a Howard Johnson billboard on the property visible from a highway after HJI had terminated the franchise agreement with Vraj Brig in October of 2006.  (HJI Complaint, Scherer Cert. Ex. 2  ¶¶ 37-47.)

In July of 2008, Plaintiff filed a claim with Twin City for his defense costs under his Hartford policy's commercial general liability coverage.  Along with the claim, Plaintiff sent a copy of the complaint filed by HJI.  (Scherer Cert. ¶ 4.)  Defendant Twin City evaluated Plaintiff's claim, determined that it fit within the intellectual property exclusion to his policy's "personal and advertising injury" coverage, and on July 30, 2008, sent him a letter denying coverage.  (Scherer Cert. Ex. 3.)

On January 14, 2010, the United States District Court for the District of New Jersey granted summary judgment in favor of Mr. Tucci, holding that he could not be held liable for violating the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), because there was no evidence that Mr. Tucci had used HJI's marks in connection

with the offer or provision of goods or services.  <u>Howard Johnson</u> <u>Int'l</u>, 2010 WL 215381 at * 6.

### J.  Procedural History

Plaintiff filed this action in July of 2008 in the Superior Court of Burlington County, Law Division, and Defendants removed the action to this Court on October 3, 2008.  [Docket Item 1.] Plaintiff moved to remand on October 28, 2008 [Docket Item 9] which the Court denied on February 25, 2009.  [Docket Items 22 & 23.]  Shortly before the Court entered its decision on the motion to remand, Plaintiff filed a Second Amended Complaint, which is his currently operative complaint, on December 16, 2008. [Docket Item 20.]  On November 15, 2010, Defendants Hartford Financial Services Group, Twin City, and Hartford Casualty filed motions for summary judgment.  [Docket Items 40, 41 & 42.]  Plaintiff opposed the motions of Defendants Twin City and Hartford Casualty on March 21, 2011 and notified the Court that he consented to the voluntary dismissal of Hartford Financial.  [Docket Items 53, 54 & 55.]  Thereafter, the Court dismissed Defendant Hartford Financial.  Defendants Twin City and Hartford Casualty filed reply briefs on May 2, 2011. [Docket Items 63 & 64.]


## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the non-moving party."
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
fact is "material" only if it might affect the outcome of the
suit under the applicable rule of law.  Id.  Disputes over
irrelevant or unnecessary facts will not preclude a grant of
summary judgment.  Id.

Summary judgment will not be denied based on mere
allegations or denials in the pleadings; instead, some evidence
must be produced to support a material fact.  Fed. R. Civ. P.
56(c)(1)(A); United States v. Premises Known as 717 S. Woodward
Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  The
nonmoving party must "do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment,
> after adequate time for discovery and upon motion,
> against a party who fails to make a showing
> sufficient to establish the existence of an element
> essential to that party's case, and on which that
> party will bear the burden of proof at trial.  In
> such a situation, there can be "no genuine issue as
> to any material fact," since a complete failure of
> proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial.

Celotex, 477 U.S. at 323.

However, the Court will view any evidence in favor of the
nonmoving party and extend any reasonable favorable inferences to
be drawn from that evidence to that party.  Hunt v. Cromartie,
526 U.S. 541, 552 (1999).  See also Scott v. Harris, 550 U.S.
372, 378 (2007) (The district court must "view the facts and draw
reasonable inferences in the light most favorable to the party
opposing the summary judgment motion.")

**B.  Coverage Disputes**

Plaintiff seeks relief under multiple theories in his Second
Amended Complaint.  His first three counts allege different
version of the same claim: that Hartford's delay in settling his
claims and denial of coverage over certain portions of his claims
amounted to a breach of its duty of good faith and fair dealing
as articulated in Pickett v. Lloyd's, 131 N.J. 457 (1993).
Plaintiff's fourth count alleges that Hartford has breached its
contract, and his fifth claim seeks a declaratory judgment that
Twin City's denial of his advertising injury claim was in
violation of the terms of the policy and a breach of the duty of
good faith and fair dealing.

In order to assess Plaintiff's right to relief under the
duty of good faith, the Court must first sort through certain
underlying disputes over coverage issues.  While neither party
disputes that the physical vandalism done to the structure of the
buildings on the premises is covered under the policy, Plaintiff

has, since filing his claim in the fall of 2006, sought to recover for the removal by Vraj Brig and the restaurant operator of the movable furnishings and trade fixtures, which Hartford consistently maintained are not covered under his policy. Additionally, Plaintiff's business income loss claims have all exceeded $1 million, which Hartford maintains is the limit of coverage under his policy.  Finally, Plaintiff has sought to recover for various repairs he has made to the roofs and HVAC unit of some of the hotel buildings, which Hartford maintains is not covered under his policy as the roofs were not damaged due to vandalism.  The Court agrees with Hartford that none of these disputed areas of loss are covered under the unambiguous language of Plaintiff's policy, for reasons now explained.

### 1.  Business income coverage $1 million limitation

Plaintiff's various claims under his business income coverage have all exceeded $1 million.  Plaintiff argues that he did not understand the policy to impose such a limit on his business income coverage because the policy is ambiguous on this issue.

Under New Jersey law, courts interpreting insurance contracts should give the words of the policy "their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability."  Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J.

26

530, 537 (1990).  "Although courts should construe insurance
policies in favor of the insured, they should not write for the
insured a better policy of insurance than the one purchased."
Id. (internal quotations omitted).  A policy is deemed ambiguous
under New Jersey law if the "phrasing of the policy is so
confusing that the average policyholder cannot make out the
boundaries of coverage."  Weedo v. Stone-E-Brick, Inc., 81 N.J.
233, 247 (1979) (quoted in Longobardi.)

Plaintiff argues that the language governing the limits of
Plaintiff's business income coverage in his Policy's Endorsement
2 is ambiguous for three reasons.  First, Plaintiff points to the
first two pages of Endorsement 2, where the "Blanket Limits" are
described.  (Rose Cert. Ex. 1 at HA 1736-37.)

Plaintiff points out that the paragraph describing the
blanket limit of the buildings and personal property coverage is
contained in a single paragraph in the middle of the page, and
the $19,442,900 total limit of that coverage is prominently
displayed.  However, Plaintiff notes, the parallel paragraph,
four rows below, describing the blanket limit of the business
income coverage is split between the first and second pages, so
that an inattentive reader might interpret the first page to
suggest that the line "Special Business Income Coverage Is Added"
(located toward the bottom of the page) is in reference to the
buildings and business personal coverage blanket limit described

27

above, rather than, instead, turning the page to encounter the
continuation of the business income paragraph which clearly
states "Blanket Limit: $1,000,000."

Secondly, Plaintiff points out that the lines below the
"Blanket Limit: $1,000,000" line indicate that the blanket limit
for the rental income has been deleted.  This, Plaintiff argues,
could be interpreted to mean that a blanket limit of $1 million
for rental income had been deleted.

Finally, Plaintiff argues that the language of Endorsement 2
is confusing because of the ways that it uses the terms "business
interruption" and "special business income" but does not specify
what is confusing about how these terms are used.

The Court finds that this section of the policy is not
ambiguous.  An average policyholder of a multimillion dollar
commercial policy like Plaintiff's would not be unable to make
out that the paragraph describing the blanket limit of the
business income coverage had wrapped from the first page to the
second.  Such a policyholder would, no doubt, be assisted in his
or her interpretation of the limits of the policy by the phrase
at the top of the second page "Policy Changes (Continued)" and
from that deduce that the floating and unattached "Blanket Limit:
$1,000,000" is referring to information from the first page.
Indeed, the average policyholder would also be aware that the
previous business income blanket limit on the policy was not $1

million, but was, instead, $100,000 (see HA 1835) and would,
therefore, not be confused by the close proximity of the
$1,000,000 blanket limit to the change in the rental income.

The Court acknowledges that the first page is mildly
confusing because the declarations regarding the changes to the
coverage blanket limits begins to wrap to the second page without
a definitive line indicating that the footer text below is
unconnected to the blanket limit declaration.  However, the Court
concludes that the average policyholder would read the rest of
the text of the Endorsement and, therefore, encounter three pages
later, on page HA 1740, that business income coverage has a
$1,000,000 limit in any one occurrence.  Thus, even if the
unexpected wrap between the first and second page raised a
question in the policyholder's mind, the second description of
the policy limit three pages later would eliminate any confusion.
Therefore, because the Court has found that the policy language
is not ambiguous, it must decline Plaintiff's invitation to re-
write his insurance policy on this point and will conclude that
Plaintiff's business income coverage is subject to the
unambiguous $1 million limit.

2.  Business personal property and insurable interest

Secondly, Plaintiff argues that the movable furnishings and
trade fixtures owned by Vraj Brig and the restaurant owner should
be covered under his policy as business personal property.

29

Therefore, Plaintiff argues, he should be reimbursed for their "loss" after they were removed by their owners on August 31, 2006.

Plaintiff argues for this surprising result by claiming that, while he may not have had actual ownership of or legal title to the personal property of Vraj Brig and the restaurant owner, he had an "insurable interest" in them.  Both parties appear to agree that the clear terms of the policy would tend to exclude from coverage property on covered premises that is not owned by the insured.  (See Rose Cert. Ex. 1 at HA 1858.) However, Plaintiff argues that while the property itself may not be covered under the policy, he had an insurable interest in that property that entitles him to recover for their loss.

The New Jersey Supreme Court has held that in certain circumstances, an individual may have an insurable interest in property that he or she does not technically own.  Miller v. New Jersey Ins. Underwriting Ass'n, 82 N.J. 594 (1980).  There, the Court held that for an individual holding an insurance policy governing property he or she does not own, "[t]he extent of coverage would be measured by the reasonable expectations of the insured, taking account of events subsequent to the time of the loss."  Id. at 602 (internal quotations omitted).

Plaintiff argues that the circumstances prior to September 1, 2006 created in him a reasonable expectation of retaining this

property despite the fact that he did not own it.  He argues that this interest began when Hartford issued its expanded coverage of the hotel premises because Plaintiff requested and paid premiums on a policy that covers up to $3,500 per room of the hotel to cover the contents of each room.  Secondly, Plaintiff argues that the Burlington County Superior Court's August 8, 2006 order to the parties that "[t]here shall be no destruction, disposal or sale of any property at the leased premises that is not in the ordinary course of the business of the motel" caused him to believe that Vraj Brig was, therefore, prohibited from removing its property from the premises prior to Plaintiff's taking possession on September 1, 2006.  (Aug. 8, 2006 Order, Schorr Cert. Ex. 4.)  The Superior Court's Order, staying execution of the warrant of removal, would expire on August 31, 2006, as discussed above.  (Aug. 17, 2006 Order, Schorr Cert. Ex. 5.)  By August 31, Vraj Brig and the restaurant owner removed all their furnishings in order to tender possession on September 1, 2006, as discussed above.

The combination of having purchased insurance that he believed would cover the personal property he did not own, in addition to his interpretation of the Burlington County Superior Court's order, Plaintiff argues, created in his mind an expectation of being able to assume possession of the hotel on September 1, 2006 and begin to operate it immediately, apparently

with the free use of the furnishings owned by those he had recently evicted.

The Court finds that, to the extent that Plaintiff had such an expectation at all, no reasonable factfinder could conclude it was a reasonable one as required under <u>Miller</u>.  First, the Court notes that there is undisputed testimony that Plaintiff was aware that Vraj Brig claimed ownership of the furnishings and fixtures of the hotel.  Indeed, there is undisputed testimony that Plaintiff was even offered the opportunity to buy or rent the property from Vraj Brig in the weeks immediately prior to September 1, 2006, which he rejected.  The Court finds that it would not be reasonable for anyone in Plaintiff's position to expect to be able to make use of goods he did not own, that he knew were being removed by the true owner, and that he had declined the offer to purchase or rent.  Further, no reasonable interpretation of the Superior Court's orders of August 8 and 17, 2006, supports a conclusion that the tenants could not remove their property on August 31, 2006.  Consequently, the Court concludes that Plaintiff's business personal property coverage is limited to those items of property that fit within the ordinary meaning of the definition of "covered property" in his policy, which excluded property owned by residents or tenants of the

Plaintiff.   (Rose Cert. Ex. 1 at HA 1857-58.)[4]

### 3.  Coverage of repairs to the roofs

Plaintiff additionally argues that his policy should also provide coverage of his repairing the roof HVAC systems and restoring the roofs of the buildings, which was necessary, Plaintiff argues, to prevent additional damage from water infiltration and freezing.  Plaintiff does not dispute that these repairs were not fixing damage caused by vandalism, but argues that, under his "Extra Expense" coverage, Hartford has agreed to "pay Extra Expenses to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form."  (Rose Cert. Ex. 1, HA 1874.)

The Court finds that this provision of the policy does not create an obligation on the part of Hartford to pay for repairs to the roof to prevent leaks unrelated to the vandalism.  The quoted section of the policy expressly states that the obligation to reimburse repairs of this kind extends only when the repair would "reduce the amount of loss that otherwise would have been

---

[4] Plaintiff additionally argues that the fact that the ownership status of particular items of property are disputed between himself and Hartford raises a sufficient dispute of fact to survive summary judgment on this point.  This is not so.  The Court's ruling on this issue is not declaring the ownership status of any particular item of property, but is merely stating that, as a matter of law, Plaintiff's business personal property coverage does not include items of property owned by residents or tenants of Plaintiff, pursuant to the terms of his policy.

payable under this Coverage Form."  The case of Plaintiff's roofs leaking does not fit within this condition.  There is no evidence in the record establishing that the leaks in the roofs or problems with the roof HVAC were the result of, or the cause of, damage or loss that would be covered under the policy.  Thus, there is no evidence from which a factfinder could conclude that the leaks in the roofs would reduce any loss for which Hartford would be obligated to pay.  (See Covered Causes of Loss and Exclusions Form, Rose Cert. Ex. 1 at HA 1892-98.)

The Third Circuit has held that

> the insurer's obligation to reimburse for acts taken to preserve or protect Covered Property does not extend to require reimbursement for prevention of damage to property that is excluded from coverage or for a circumstance that is not a covered cause of loss.

Buczek v. Continental Cas. Ins. Co., 378 F.3d 284, 293 (3d Cir. 2004).  Plaintiff's argument to the contrary is, frankly, legally frivolous.  Thus, the Court concludes that Hartford is not obligated under the provision of the policy cited by Plaintiff to cover repairs to the roofs absent evidence that the roofs were damaged by a covered cause of loss.

## B.  Hartford's Duty of Good Faith and Fair Dealing

Having concluded that Plaintiff's insurance coverage does not extend to covering business personal property that was not owned by Plaintiff at the time of the damage, nor to the roof repairs Plaintiff has undertaken since September 1, 2006, and

that Plaintiff's business income coverage is limited to $1
million, the Court will now turn to determining whether
Plaintiff's claims for breach of the duty of good faith will
survive summary judgment.  The New Jersey Supreme Court has held
that

> an insurance company may be liable to a
> policyholder for bad faith in the context of
> paying benefits under a policy.  The scope of
> that duty is not to be equated with simple
> negligence.   In the case of denial of
> benefits, bad faith is established by showing
> that no debatable reasons existed for denial
> of the benefits.  In the case of processing
> delay, bad faith is established by showing
> that no valid reasons existed to delay
> processing the claim and the insurance company
> knew or recklessly disregarded the fact that
> no valid reasons supported the delay.

Pickett, 131 N.J. at 481.  Thus, to survive summary judgment on
these claims, Plaintiff must point to a genuine dispute of
material fact over whether Hartford had a debatable reason for
denial of any benefits claimed, or disputes of fact establishing
both that Hartford had no valid reason to delay processing the
claim and that Hartford knew it had no valid reason.  The Court
concludes, based on this complete record, that there is no
dispute of fact that Hartford had at least a debatable reason to
deny payment of Plaintiff's claims in excess of the coverage
permitted under his policy, and there is no dispute of fact that
Hartford had a valid reason to delay processing the otherwise
valid portions of his claims.

Plaintiff contends that Hartford delayed paying the undisputed portion of his claim and denied his claims for recovery on the theft of property and damage to much of the hotel premises for no debatable reason.

With regard to Hartford's denial of Plaintiff's claims for recovery in excess of his policy, the Court finds that Hartford had better than merely debatable reasons for such denial. Because the Court has already determined that Plaintiff is not entitled under his policy to recover for Vraj Brig's removal of its movable furnishings and other business personal property Plaintiff did not own, the Court must conclude that Hartford's denial of those portions of his claim were not in bad faith. The same result is required for Hartford's denial of Plaintiff's claims to recover for the repair of the roofs, and Hartford's denial of any portion of Plaintiff's business income claim in excess of $1 million. Thus, the only question that remains is whether Hartford's delay in payment of the undisputed portion of Plaintiff's claim was in bad faith.

Plaintiff points to several facts in the record that he contends raise a dispute of fact over whether Hartford had a valid reason to delay payment. First, Plaintiff argues that Hartford had access to sufficient pieces of information, such as the Northeast lease, the Northeast income statements, and Schleifer's inspection reports, that would have enabled it to

36

offer full actual cash value within a few months of the
vandalism.  Second, Plaintiff argues that his own persistent
refusal to provide documentation of his claims was not a valid
reason for Hartford to delay.  He explains that Hartford should
not have needed any documentation of his property claim at all in
order to justify paying the actual cost value portion of his
claim, as he would be entitled to such a payment whether he
repaired and replaced the lost and damaged property or not.
Finally, Plaintiff argues that, at the very least, after Hartford
received Plaintiff's financial printouts in October of 2009, it
should then have paid his claims.  Additionally, Plaintiff points
out that Hartford has never offered an advance payment on any
undisputed portion of his business income claim, despite the fact
that uncontested evidence in the record demonstrates that
Hartford's adjuster Jonathan Rose had speculated that a business
income claim of $50,000 per month could be justified.

     The Court finds Plaintiff's arguments to be unavailing.  At
least two potentially valid reasons for the delay in paying
Plaintiff's property claims are undisputed in the record, as is
an additional valid reason for delaying payment of Plaintiff's
business income claim.  First, it is undisputed that Plaintiff
refused to provide reasonable documentation requested by Hartford
to verify Plaintiff's claims.  In a recent non-precedential
opinion, the Third Circuit found that an insurance claimant's

"failure to produce requested documents in a timely manner" established a valid or debatable reason to delay or deny his claim.  Ketzner v. John Hancock Mutual Life Ins. Co., 118 F. App'x 594, 599 (3d Cir. 2004).  The Court finds this reasoning persuasive, and disagrees with Plaintiff's argument that, because Ketzner was a case about bad faith denial rather than bad faith delay, that the case has no applicability here.  See Pickett v. Lloyd's, 131 N.J. at 474 (recognizing that, under New Jersey law, the tests for bad faith denial and bad faith delay are "essentially the same").  The case at bar provides an even stronger case for the validity of Hartford's delay than the insurer in Ketzner, given that Hartford's investigation of his claim (hindered by Plaintiff's recalcitrance) has revealed Plaintiff's repeated attempts to recover for losses not covered under his policy.  The prominence of Plaintiff's multiple invalid claims presents ample justification for the insurer's caution in processing disputed claims.

The Court holds that Plaintiff cannot unilaterally determine when the insurer has enough information and refuse thereafter to cooperate with the insurer's reasonable requests for material, substantiating information.  See DeMasi v. Lexington Ins. Co., 2010 WL 3075674, N.J. Super at * 8 (App. Div. Jul. 23, 2010) ("We do not find plaintiff's argument of substantial compliance persuasive. The fact that he may have furnished other information

does not excuse his failure to comply with a request for information that was material to Lexington's investigation.")

Second, the Court concludes that Plaintiff's refusal to sign the undisputed proof of loss form is a valid reason to delay settling Plaintiff's property claim.  The policy itself states that Plaintiff's signing a proof of loss form is a prerequisite to Hartford's obligation to pay any claim.  (Rose Cert. Ex. 1 at HA 1850.)  Hartford even agreed to permit Plaintiff to insert his conditions or qualifications upon the form to preserve Plaintiff's position, as discussed above, which demonstrated Hartford's flexibility and responsiveness, contrary to Plaintiff's unsupported argument.

Finally, even if Plaintiff were able to point to evidence in the record that raised a dispute of fact over whether these reasons to delay paying Plaintiff's property claim were valid, the Court would still be compelled to grant Defendant summary judgment, as Plaintiff has pointed to no evidence in the record that would raise a dispute of fact over whether Hartford knew or was recklessly indifferent to the invalidity of either of these reasons.  No reasonable factfinder, even giving Plaintiff the benefit of any favorable inferences arising from this evidence, could find in Plaintiff's favor that Hartford had no debatable reason to delay paying Plaintiff's property claim.

On a similar basis, the Court finds that Hartford's delay in

processing Plaintiff's business income claim is based on a valid reason because Plaintiff has refused to provide substantiating documentation that would permit Hartford's adjuster to verify the appropriate coverage period and appropriate quantity of income lost.  That Hartford had access to piecemeal sources of such information is no better a rejoinder to the delay of the business income claim than to the property claim.  The Court also finds that Jonathan Rose's internal note regarding Plaintiff's business income claim was not a conclusion of the company based on verifiable data, sufficient to justify the payment.  One reason apparent from the record why the notation was incomplete as a finding of business income loss is that it contains no estimate as to the duration of the period of loss, but merely states that, over an undetermined period, Plaintiff may be able to justify a loss of $50,000 per month.  Thus, the Court determines that Plaintiff's failure to provide sufficient data on which to base a claim for business income loss is a valid reason to delay the payment of that claim.

Therefore, because Plaintiff has not met his burden of pointing to evidence sufficient to raise a dispute of fact over the essential elements of his bad faith claims, the Court will grant Defendant Hartford's motion for summary judgment upon

Counts I-III of the Second Amended Complaint.[5]

### C.  The HJI Trademark Defense Claim

Defendant Twin City also seeks summary judgment against Plaintiff's request for a declaratory judgment that Twin City owed Plaintiff a duty to defend it against HJI's trademark infringement action.  Because the Court finds the intellectual property exclusion unambiguous, the Court will grant Defendant Twin City's motion.

Plaintiff argues that Twin City wrongly denied his claim that it owed him a duty to defend against HJI's trademark action because the policy language governing the "personal and advertising injury" coverage in his policy is ambiguous. Specifically, Plaintiff argues that HJI's trademark action arguably fits within the coverage of the policy because Plaintiff's use of HJI's logo and trademarks as alleged by HJI amounted to an "advertising idea" covered under the policy.  (See Scherer Cert. Ex. 1 at HA 1945) (defining "personal and advertising injury" to include "copying, in your 'advertisement,' a person's or organization's 'advertising idea' or style of 'advertisement.'")

---

[5] Because the Court has concluded that summary judgment over these claims is warranted, it need not reach Defendant's argument in favor of granting summary judgment against Plaintiff's requested punitive damages, other than to observe that Plaintiff's claim for punitive damages necessarily fails as a matter of law for lack of underlying liability.

Further, Plaintiff argues that the policy's exclusion for infringement of intellectual property rights does not apply to his case because the policy only excludes "personal and advertising injury arising out of any <u>violation</u> of any intellectual property rights . . ." (<u>Id.</u> at HA 1934) (emphasis added.)  Plaintiff argues that the exclusion cannot apply to him because the United States District Court of the District of New Jersey found that, as a matter of law, he had not violated HJA's trademarks as alleged.  <u>Howard Johnson Int'l</u>, 2010 WL 215381 at *6.

Plaintiff's argument is unavailing.  The plain and unambiguous language of the policy reads that Twin City "will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply."  (Scherer Cert. Ex. 1 at HA 1933.) Thus, because HJI was seeking damages for trademark violations, and the insurance policy does not apply to trademark violations, Plaintiff's defense of HJI's suit clearly fell outside the scope of the policy provision.  It is enough that HJI's suit sought damages for trademark violations, whether or not HJI ultimately proves such violations, that excluded the HJI suit from Twin City's duty to defend Plaintiff.  When the policy language is unambiguous, the Court must enforce it's plain meaning, which in this case means that Defendant Twin City had no obligation to

provide for Plaintiff's defense.

Finally, the Court agrees with Defendant's argument that Plaintiff's interpretation of the policy, beyond being an unreasonable interpretation of the language, would result in the absurd implication that the insurer would be forced to defend every intellectual property claim that is filed against an insured up until the end of the case when the insurer would then learn if it did, in fact, have the duty to provide such defense. The Court is persuaded that such an interpretation would not be reasonable in light of the clear purpose of the intellectual property exclusion, which is to offer no defense or indemnification in a suit for violations of trademark rights.

Because the Court has concluded that Plaintiff's claim was correctly denied, the Court must also enter summary judgment against Plaintiff's bad faith denial claim against Twin City.

**D.  Dismissal Without Prejudice**

Finally, Defendant Hartford asks the Court to dismiss the action without prejudice to reopening at the conclusion of the policy's mandatory appraisal process.  New Jersey contract law permits such dismissal to enforce the terms of a contract containing a mandatory appraisal clause.  See Rock-N-Rolls Auto Salon, Inc. v. United States Fidelity & Guaranty Co., 2006 WL 1675699, N.J. Super. at *2 (App. Div. 2006) (affirming dismissal to compel appraisal).

43

Plaintiff argues that such dismissal would be inappropriate in the instant case for two reasons.  First, Plaintiff argues that because the parties' disputes involved unresolved coverage disputes, which required determination in a court of law rather than in an appraisal, the Court should deny the request.  Second, Plaintiff argues that Defendants have selected a biased appraiser.

With regard to Plaintiff's first concern, the Court notes that all known disputes over the scope of coverage have now been resolved, and the only remaining issues of dispute between the parties are factual and valuation questions well suited to resolution in an appraisal.

On Plaintiff's second argument, the Court is similarly unpersuaded.  While New Jersey courts have recognized the importance of the impartiality of the appraisers in a dispute-resolving appraisal, not every connection and potential sympathy necessarily renders the appraiser biased or partial.  See Heller v. Hartz Mountain Indus., Inc., 270 N.J. Super. 143, 156-57 (L. Div. 1993) (defining disinterested appraiser as "impartial, unbiased, free from partisanship and able to do equal justice between the parties;" finding appraiser subject to the direction or control of one of the parties to not be impartial).  Thus, Plaintiff's argument that Hartford's proposed appraiser has accepted payment from Hartford for his preparation of an expert

44

report in this matter, without more, is insufficient for the Court to find him biased.  As Hartford points out, the policy itself requires that each party pay its own appraiser, which necessarily implies that the sufficient level of impartiality can be compatible with being paid by only one side to the dispute. (Rose Cert. Ex. 1 at HA 1850.)  Moreover, there is no allegation that Hartford's appraiser has demonstrated or expressed bias in favor of Hartford or against Tucci, nor that his impartiality could reasonably be questioned on some other ground.  The Court agrees that, absent evidence of having a pecuniary interest in the outcome or being subject to one side's direction or control, or some other more substantial bias, or other basis to question the appraiser's impartiality, the Court will not set aside the parties' agreement to submit disputes to an appraisal in this case, consistent with the general preference for the appraisal procedure recognized by New Jersey courts.  Ward v. Merrimack Mut. Fire Ins. Co., 332 N.J. Super. 515, 528 (App. Div. 2000). The Court will, consequently, enforce the terms of the contract and dismiss this action without prejudice to pursuit of the remaining issues in the contractual appraisal process.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff's Hartford insurance policy does not provide more than

$1 million in blanket coverage for business income loss. Additionally, the Court concludes that the policy likewise does not obligate Hartford to pay for repairs done to a roof that was not damaged by a covered cause.  The Court also finds that Plaintiff's business personal property does not cover property that does not belong to the insured and that is not in his care, custody and control.  The Court also concludes that Plaintiff's personal and advertising injury policy does not cover defending Plaintiff against trademark claims, even though Plaintiff was later found to have not violated any intellectual property right. Further, the Court concludes that summary judgment should be entered against Plaintiff's bad faith claims against both Hartford and Twin City.  And finally, the Court concludes that the action should be dismissed without prejudice to resolving the remaining disputes (pertaining to the quantum of the covered loss) in the contractual appraisal process.


**June 27, 2011**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           United States District Judge